## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHERI SPEER,

       Plaintiff,

v.

CITY OF NEW LONDON

       Defendant.

Civil Action No. 3:20-cv-1928

**APRIL 30, 2021**

## MEMORANDUM AND ORDER
## REGARDING SUBJECT MATTER JURISDICTION

**HAIGHT, Senior District Judge:**

In this action, removed pursuant to 28 U.S.C. § 1441 from Connecticut Superior Court, Plaintiff Sheri Speer ("Speer"), proceeding *pro se*, seeks a temporary restraining order or preliminary injunctive relief against Defendant City of New London (the "City" or "New London") pursuant to Rule 65 of the Federal Rules of Civil Procedure.[1] *See generally* Doc. 9 ("Pl.'s Mot.").

Speer seeks to prevent New London from conducting involuntary tax auction sales of two properties she owns in the City pursuant to Conn. Gen. Stat. § 12-157, arguing that were such sales to take place under the State of Connecticut's COVID-19 rules—which have been implemented through various executive orders of Governor Ned Lamont—they would cause a taking under the Fifth Amendment to the federal Constitution. *See id.*; *see also generally* Doc. 1-1 at 3–10 ("Compl.").

---

[1] Although Speer does not cite Rule 65 as the basis for her motion, as her motion papers in this Court are identical to those filed in Connecticut Superior Court, Rule 65 is the correct procedural vehicle for Speer's petition for temporary or preliminary injunctive relief. *See* Fed. R. Civ. P. 65.

In opposition to Speer's motion, New London argues that a temporary restraining order or preliminary injunctive relief should not issue on the grounds that Speer's motion is either moot or not ripe, and that Speer has not shown, *inter alia*, that she lacks an adequate remedy at law or that she is likely to prevail on the merits.   *See generally* Doc. 18 ("Def.'s Opp.").

The Court held oral argument on February 2, 2021 to consider the issues raised by the Parties.   *See generally* Doc. 21 ("Hr'g Tr.").   The Court subsequently directed the Parties to submit additional briefing addressing, *inter alia*, whether this Court lacks jurisdiction over this action under the Tax Injunction Act, 28 U.S.C. § 1341, or should decline to hear it under the related doctrine of comity.   *See* Doc. 22.

For the reasons set forth below, the Court concludes that it lacks subject matter jurisdiction over this action, in light of the Complaint's prayers for declaratory and injunctive relief.   Accordingly, the Court DENIES WITHOUT PREJUDICE Speer's pending motion for temporary injunction in this Court, DENIES AS MOOT Speer's motion to waive bond (Doc. 8), and REMANDS this case to the Connecticut Superior Court for the Judicial District of New London for any and all further proceedings.

I.      **Background**

a.   **Connecticut's Non-Judicial Tax Sale Procedure**

At the outset, it is useful to review Connecticut's statutory scheme permitting municipalities to sell taxpayers' properties involuntarily to collect delinquent taxes owed. Those statutes underlie the instant dispute.

Section 12-155 of the Connecticut General Statutes provides that if any person fails to pay any local tax due, a municipality's collector may make a demand, either in person or in writing, for payment of the tax owed, and may subsequently "enforce by levy and sale any lien

or warrant upon real estate for any unpaid tax or levy upon and sell such interest of such person in any real estate as exists at the date of the levy for such tax." Conn. Gen. Stat. §§ 12-155(a), 12-155(b)(2). Once a municipal collector levies a warrant on a taxpayer's property, the collector must provide notice of the warrant and planned sale of the property in the manner prescribed by statute, including such details as "the name of the taxpayer, a legal description of the real property . . . the amount of the tax or taxes due, including any interest and charges . . . as of the last day of the month immediately preceding the notice, a statement that additional taxes, interest, fees . . . accruing after the last day of the month immediately preceding the notice are owed in addition . . . and the date, time and place of sale." Conn. Gen. Stat. § 12-157(a). This notice must be posted publicly, recorded by the municipal clerk as part of the land records of the municipality, and sent by certified mail to the taxpayer and any mortgagee or lienholder whose interest will be affected by the sale. *Id.* This posting, filing, and mailing must take place not more than twelve weeks and not less than nine weeks before the planned sale. *Id.* Further notice of the warrant and sale must be published in a newspaper circulating in the municipality at specified times. *Id.* Notices similar to the newspaper notices also must be delivered to the taxpayer and other interest holders. *Id.*

After notices have been posted, published, and sent in the manner prescribed by statute, and at the time set forth by those notices (or at the time to which the sale has been adjourned),[2] the collector "(1) may sell at public auction to the highest bidder all of said real property, to pay the taxes with the interest, fees and other charges allowed by law . . . or (2) may sell all of said real property to his municipality if there has been no bidder or the amount bid is insufficient to

---

[2] A tax auction sale may be adjourned by the municipal collector for any reason "by causing public notice of such adjournment and the time and place of such adjourned sale to be given either by oral announcement or posting of a written notice at the time and place designated for the sale in the notices of such sale." Conn. Gen. Stat. § 12-157(b).

pay the amount due."   Conn. Gen. Stat. § 12-157(c).   Under ordinary circumstances, the

conduct of the auction largely is left to the discretion of the collector organizing it:

> The tax collector may publish or announce any rules for the
> orderly conduct of the auction and the making of payment by
> successful bidders which are not inconsistent with the requirements
> of law. The tax collector or the municipality may retain the
> services of auctioneers, clerks and other persons to assist the tax
> collector in the conduct of the sale and the cost of such persons
> paid for their services shall be added to the taxes due from the
> delinquent taxpayer. If more than one property is sold, the tax
> collector shall apportion all shared costs equally among all the
> properties.

Conn. Gen. Stat. § 12-157(d).   If the sale realizes an amount in excess of the amount of the

delinquent taxes, as well as any interest, penalties, fees, and costs, that excess amount is held in

an interest-bearing escrow account by the municipality.   Conn. Gen. Stat. § 12-157(i)(1).

Following the tax auction sale, the collector must execute a deed to the purchaser of the

taxpayer's property or to the municipality conducting the sale, and must file the deed with the

municipality's clerk, who is to leave the deed unrecorded for a period of six months from the

date of the sale.   Conn. Gen. Stat. § 12-157(e).   During this six month period, the taxpayer or

any mortgagee or lienholder whose interest is affected by the sale enjoys a right to redeem the

property upon payment to the collector of "the amount of taxes, interest and charges which were

due and owing at the time of the sale together with interest on the total purchase price paid by the

purchaser at the rate of eighteen per cent per annum from the date of such sale plus any taxes and

debts owed to the municipality that were not recovered by the sale and any additional charges

under [Conn. Gen. Stat. § 12-140]."   Conn. Gen. Stat. § 12-157(f).   As relevant here, if the

property is *not* timely redeemed, and there is an amount held in escrow after the auction sale, the

amount held in escrow may be used to pay any remaining delinquent taxes, interest, penalties,

fees and costs due on the auctioned property or any other property of the taxpayer, including

personal property and motor vehicles.   Conn. Gen. Stat. § 12-157(i)(1)(B).   Once those amounts are paid, the collector must pay any remaining amount held in escrow to the clerk of the court for the state judicial district in which the property is located; the delinquent taxpayer, or any mortgagee or lienholder whose interest is affected by the sale, then may apply to the court for the return of this money.   *Id.*; Conn. Gen. Stat. § 12-157(i)(2).

While a tax auction sale is conducted in the first instance under the auspices of a municipal collector alone, the process is not entirely immune from judicial scrutiny.   *See Jacobson v. A1Z7, LLC (In re Jacobson)*, 523 B.R. 13, 21 (Bankr. D. Conn. 2014).   Flaws in the tax auction process may provide a basis for actions for declaratory relief, injunctive relief, as well as for damages.   *See* Conn. Gen. Stat. §§ 12-159a(a), 12-159a(c); *see also Assocs. Fin. Servs. of Am., Inc. v. Sorensen*, 700 A.2d 107, 111 (Conn. App. Ct. 1997) ("Even if the tax collector were to misuse his authority and subvert the fairness of the tax sale, this would not render General Statutes § 12-157 violative of procedural due process. Rather, the plaintiffs' remedy would be a common law action, such as an action for a declaratory judgment and injunction." (quoting *Pace Motor Lines, Inc. v. Biagiarelli*, No. 318117S, 1996 WL 383398, at *14 (Conn. Super. Ct. June 24, 1996))).

**b.  Governor Lamont's Executive Orders Concerning COVID-19**

Since March 2020, the COVID-19 pandemic has caused death and serious illness across this country, including many victims in the State of Connecticut.[3]   To protect the public health and slow the progress of this disease through the community, Connecticut Governor Ned Lamont has promulgated multiple executive orders altering the conduct of business, government, and daily life in the state pursuant to his powers under Conn. Gen. Stat. § 19a-131a and § 28-9

*See Casey v. Lamont*, ___ A.3d ____, 2021 WL 1181937, at *2 (Conn. 2021); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 208 (D. Conn. 2020).[4]

Several of Governor Lamont's orders have included provisions affecting the non-judicial tax auction sale process that is central to this case.[5]

On April 1, 2020, Executive Order 7S suspended all non-judicial tax sales in the state until thirty days after the end of the public health and civil preparedness emergencies that had been declared by the Governor, including sales that had been noticed prior to March 10, 2020. Exec. Order 7S § 11.[6]  Tax sales remained suspended throughout the spring and summer of 2020.

[3] As of the date of this decision, 338,447 people in Connecticut are known or suspected to have contracted COVID-19, and 8,084 are known or suspected to have perished from it.  *See* CT.gov, Connecticut COVID-19 Data Tracker, https://portal.ct.gov/coronavirus/covid-19-data-tracker (last visited April 30, 2021).

[4] The Court notes that, to date, parties challenging Governor Lamont's COVID-19 executive orders largely have failed to show that those orders violate (or likely violate) the provisions of the federal Constitution.  *See Auracle Homes*, 478 F. Supp. 3d at 220–27 (finding, on motion for preliminary injunction, that executive orders temporarily limiting the ability of residential landlords to initiate eviction proceedings against tenants and allowing tenants to apply security deposit funds to past due rents were not likely to violate the Takings Clause, the Contracts Clause, and the Fourteenth Amendment Due Process Clause of the federal Constitution); *Amato v. Elicker*, No. 3:20-cv-464, 2021 WL 1430918 (D. Conn. Apr. 15, 2021) (holding, in relevant part, that plaintiffs failed to state claims under First, Fifth, and Fourteenth Amendments in action challenging executive orders' restrictions on operations of restaurant); *see also Libertarian Party of Conn. v. Merrill*, 470 F. Supp. 3d 169 (D. Conn. 2020), *aff'd sub nom. Libertarian Party of Conn. v. Lamont*, 977 F.3d 173 (2d Cir. 2020); *Murphy v. Lamont*, No. 3:20-CV-0694 (JCH), 2020 WL 4435167 (D. Conn. Aug. 3, 2020); *Vincent v. Bysiewicz*, No. 3:20-cv-1196 (VAB), 2020 WL 6119459 (D. Conn. Oct. 16, 2020); *but see Conn. Citizens Def. League, Inc. v. Lamont*, 465 F. Supp. 3d 56 (D. Conn. 2020) (granting preliminary injunction in action claiming that executive order's indefinite suspension of fingerprinting for handgun permit applications violated permit-seekers' rights under the Second Amendment). Furthermore, the Connecticut Supreme Court has upheld Governor Lamont's authority to issue the COVID-19 executive orders under state statutory and constitutional law.  *Casey*, 2021 WL 1181937, at *2, *8–*9, *12–*13 (holding that section 28-9 provides governor with authority to issue the challenged executive orders, and further holding that section 28-9 is not an unconstitutional delegation of legislative authority to the governor in violation of the separation of powers provision of the Connecticut constitution).

[5] All of the declarations and executive orders issued by Governor Lamont related to the COVID-19 pandemic are accessible on the website for the State of Connecticut, of which the Court takes judicial notice. *See generally* CT.gov, Emergency Orders Issued by the Governor & State Agencies, https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-Agencies (last visited April 30, 2021).

[6] Executive Order 7S additionally modified the time available to redeem properties that already had been sold at auction, where those redemption periods had not yet expired, as well as adjusted the interest calculations for the amounts necessary to redeem properties.  *See* Exec. Order 7S § 11.

On September 16, 2020, the Governor issued Executive Order 9C, allowing municipalities to resume tax sales for all properties where notices of levy had been filed prior to April 1, 2020, as well as to institute new tax sales.   Exec. Order 9C §§ 2(a)–2(b).[7]   Executive Order 9C further required that any municipality "conducting an in-person auction . . . take steps consistent with recommendations by local or state public health officials and follow applicable guidance from the Centers for Disease Control and Prevention to reduce the transmission of COVID-19, including . . . maintaining distance of at least six feet between all people present, requiring masks, limiting exposure to shared surfaces, and conducting auctions outdoors or in well-ventilated venues large enough to maintain appropriate distances between all people present."   *Id.* § 2(c).   The order additionally provided that any purchaser of a residential property through a tax sale was to be deemed a "landlord" within the meaning of the Governor's orders protecting rental tenants affected by the pandemic, and thus subject to their strictures.   *Id.* § 2(e).

Executive Order 9C originally was intended to expire on November 9, 2020.   By further orders of the Governor, Executive Order 9C's auction conduct requirements were extended to April 19, 2021.   *See* Exec. Order 9L § 1 (extending unexpired executive orders to February 9, 2021); Exec. Order 10A § 1 (extending unexpired executive orders to April 19, 2021).

On April 19, 2021, Governor Lamont once more renewed his declaration of public health and civil preparedness emergencies through at least May 20, 2021.   *See* Governor Ned Lamont, Extension of Declaration of Civil Preparedness & Public Health Emergencies (April 19, 2021). Concurrent with the issuance of this declaration, Governor Lamont renewed the State's general requirement that all people wear facial coverings in public places where social distancing is not

---

[7] However, municipalities could not institute or resume tax sales against "taxpayer[s] whose oldest outstanding delinquenc[ies are] less than one year old as of" September 16, 2020.   Exec. Order. 9C § 2(f).

possible.   Exec. Order 11 § 1 (incorporating by reference Executive Order 7NNN § 1). Governor Lamont additionally issued Executive Order 11A, delegating to the Connecticut Department of Economic and Community Development ("DECD") the power to develop legally binding guidance—known as "Sector Rules"—that will govern "conduct of social, recreational, athletic, and economic activity including, but not limited to, the size of social, recreational, or civic gatherings, authorized capacity of businesses or events, mask requirements for activities and venues covered by Sector Rules, physical and operational restrictions, distancing measures, and any other rules or limits that [DECD], in consultation with the Commissioner of Public Health, deems necessary to protect the public health and safety."   Exec. Order 11A § 1.   It appears that such rules, once issued, will supplant the directives of Executive Order 9C, among others, since Executive Order 9C was not itself extended by Executive Order 11 or another order of the Governor issued at the time of the latest public health emergency declaration.

### c.   New London's Planned Auction of Speer's Properties and the Instant Dispute

Speer, a taxpayer, is the owner of two properties in New London, which are located at 12 Lee Avenue and 372 Jefferson Avenue, respectively.   Compl. ¶ 1.   At some point, Speer evidently became delinquent on taxes owed to the City: New London sent a tax warrant on the Lee Avenue property to the marshal on October 3, 2019.   Doc. 18-1 ¶ 7 ("Def.'s Aff.").[8] Following the Governor's September 16, 2020 order permitting tax sales to recommence, Speer's property at 12 Lee Avenue was noticed for auction on December 10, 2020.   *Id.* ¶ 6.[9]   At the

---

[8] It is unclear from the Parties' papers when a tax warrant on the Jefferson Avenue property may have been sent to the tax marshal.

[9] In her complaint, Speer represents that both the Lee Avenue property and the Jefferson Avenue property were noticed for auction on December 11, 2020.   Compl. ¶ 2.   By affidavit of its tax collector, New London avers that "372 Jefferson Avenue . . . was not listed by [the City] to be sold at a tax auction on December 10, 2020."   Def.'s Aff. ¶ 10.

time Speer filed her Complaint and her motion for temporary injunctive relief in Connecticut Superior Court, this auction was still pending. *See* Compl. ¶¶ 2, 8, 18. The sale of the Lee Avenue property did not take place as scheduled, however. Def.'s Aff. ¶ 8. At the hearing on this matter, Speer stated that the day before the planned auction, the marshal informed her it would be canceled "because there was a typo in the paperwork," and that the auction would be rescheduled to June 2021. Hr'g Tr. 9:10–9:18. In its affidavit, New London avers that no auction date has yet been set for either of Speer's properties. Def.'s Aff. ¶¶ 9, 12.

In her Complaint and her motion for temporary injunctive relief, Speer alleges that Governor Lamont's orders regarding the COVID-19 pandemic "include numerous facets that would impair a tax sale auction, or any auction, for that matter." Compl. ¶ 5; *see also* Pl.'s Mot. at 1. According to Speer, facial coverings requirements limit the ability of tax auction participants to communicate with one another, *id.*, and social distancing requirements "impair[] the ability to conduct a live auction that would most closely approximate the true, fair market value of the properties being sold," Compl. ¶ 5. Meanwhile, Speer claims that the Governor's orders protecting residential tenants constitute "rent holidays imposed by way of eviction[] moratoriums, which . . . impair the value of the properties subject to auction, thus artificially depressing their value." *Id.* ¶ 6; *see also* Pl.'s Mot. at 1. In addition, Speer alleges that the Governor's orders are confusing and of uncertain duration, and that they "deny[] prospective bidders information necessary to inform their bids, such as . . . knowing what comparable properties would sell for, how much capital would be available to them to bid and those in the Plaintiff's position to redeem and the true condition of the property itself [is] reasonably expected to change as rent moratoriums are extended." Compl. ¶¶ 13–14.[10]

---

[10] Speer's Complaint also alleges that "under the executive orders, specifically 7NNN and 9B, anyone who travels to the auction from out of state risks a fine for attempting to participate in person." Compl. ¶ 15. The Court notes

Speer claims that, as a result of the Governor's orders, "there is no true auction that can be held for the purposes of General Statutes § 12-157 because of limits on communication and participation." Pl.'s Mot. at 1. Speer alleges that if New London were to conduct auctions of her properties using the Conn. Gen. Stat. § 12-157 procedure while the Governor's orders remain in effect, "an auction under these circumstances would result in an unfair taking." Compl. ¶ 12. To be more precise, the "harm she will suffer is a sub-par auction . . . that artificially deflates the price of the properties, and thus, an unconstitutional forfeiture of monies that would otherwise go toward payment of the loans or in the event of a surplus, to the Plaintiff herself." *Id.* ¶ 8; *see also* Pl.'s Mot. at 6 ("The result is a deprivation of any possibility of excess proceeds that would be used to pay off secondary lienholders and otherwise result in a net surplus return above those obligations. By extension, the result is an unjust taking from the Plaintiff by the Defendant in the form of impairing the auction's functionality.").

Pursuant to 42 U.S.C. § 1983, Speer seeks declaratory relief regarding her alleged Fifth Amendment rights, as well as injunctive relief to prevent New London from holding tax sale auctions of her properties while the Governor's COVID-19 orders remain in effect. Compl. ¶¶ 12, 16. Speer's Complaint also prays for an award of damages and costs. *Id.* at 8.

### d. Procedural History

On November 11, 2020, Speer filed a verified complaint in the Connecticut Superior Court, containing the foregoing allegations. Doc. 1 at 1 ("Def.'s Notice"). Simultaneously,

---

that Executive Order 7NNN pertains to facial coverings in public places, not travel restrictions. *See generally* Exec. Order 7NNN. Meanwhile, that portion of Executive Order 9B that did pertain to restrictions on interstate travelers—*i.e.*, section 1—has been superseded, first by Executive Order 9C § 1, and then by Executive Order 9I § 1, Executive Order 9S § 1, and Executive Order § 10D § 2. Since March 19, 2021, interstate travelers from non-exempt jurisdictions no longer are required to quarantine or provide proof of a satisfactory COVID-19 test before moving about the state. Exec. Order 10D § 2. However, all travelers continue to be advised to follow appropriate guidance issued by the Centers for Disease Control and Prevention and the state Department of Public Health. *See* CT.gov, Travel Advisory for Connecticut During the COVID-19 Pandemic, https://portal.ct.gov/Coronavirus/Travel (last visited April 30, 2021).

Speer moved for temporary injunctive relief, to prevent New London from conducting the auction of her property scheduled for early December. *See generally* Doc. 1-1 (Def's Notice Ex. A). Speer's application to the Superior Court bore a return date of December 8, 2020, and the City was served on December 7, 2020. Def.'s Notice at 1. The Superior Court did not schedule a hearing on Speer's Complaint and motion, and the City filed its Notice of Removal to this Court on December 29, 2020. *See generally id.*; *see also* Doc. 17 (Pl.'s Decl. Regarding Service). Speer's motion for temporary injunctive relief was docketed with this Court on December 29, 2020, along with a motion to waive bond. *See* Docs. 8–9. New London opposed Speer's motion for temporary injunctive relief on January 26, 2021. *See generally* Def.'s Opp. As noted above, the Parties appeared for oral argument on Speer's motion on February 2, 2021. *See* Docs. 20–21.

In removing this action, New London has represented that this case is within the scope of this Court's subject matter jurisdiction under 28 U.S.C. § 1331 because the Complaint facially presents a question regarding the deprivation of rights guaranteed under the United States Constitution,[11] and that it is removeable pursuant to 28 U.S.C. § 1441.[12] Def.'s Notice at 1–2.

---

[11] New London also has stated that this Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1343(a)(3). *See* Def.'s Notice at 1. Section 1343(a)(3) and section 1343(a)(4) are jurisdictional counterparts to 42 U.S.C. § 1983, granting this Court jurisdiction of cases with claims for equal rights or civil rights brought under section 1983. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600 (1979) (holding that section 1343 jurisdiction does not "encompass[ ] a claim that a state welfare regulation is invalid because it conflicts with the Social Security Act" because the Social Security Act is not one meant to secure equal or civil rights); *Kohl Indus. Park Co. v. Rockland Cty.*, 710 F.2d 895, 899 (2d Cir. 1983) ("[Section 1343 is] the jurisdictional predicate for section 1983 actions . . . . Where the plaintiff's complaint alleges sufficient facts to state a cause of action under section 1983, the jurisdictional requirements of section 1343 are satisfied, provided the claim alleged is not 'obviously frivolous,' 'wholly insubstantial,' or 'essentially fictitious.'" (citations omitted)). Since the elimination of 28 U.S.C. § 1331's amount-in-controversy requirement decades ago, 28 U.S.C. § 1343(a)(3) has been a redundant statutory grant of jurisdiction. *See* 13D Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 3573 n.18 (3d ed. 2020).

[12] New London also has stated that this case is removeable pursuant to 28 U.S.C. § 1443. Def.'s Notice at 1. Section 1443 provides that an action commenced in state court may be removed by the defendant when either (1) the action is one "[a]gainst any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States," or (2) the action is one concerning "any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground

Following oral argument and further consideration of the Parties' submissions, I ordered the Parties to submit briefs on a simultaneous basis addressing, *inter alia*, whether the Tax Injunction Act, 28 U.S.C. § 1341, and the associated doctrine of comity, *see, e.g.*, *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100 (1981), prohibit this Court from hearing this action.  *See* Doc. 22.  Speer submitted her supplemental brief ("Pl.'s Supp.") on March 1, 2021, and New London submitted its supplemental brief ("Def.'s Supp.") on March 2, 2021.  *See* Docs. 23–24.

## II.    Legal Standard

At the outset of any case, the Court must consider whether the action falls within its subject matter jurisdiction.  Federal district courts—like this Court—are courts of *limited* subject matter jurisdiction: they only may hear and decide those types of cases to which the federal Constitution extends the judicial power of the United States and of which Congress has granted the district courts jurisdiction.  *See* 13 Charles A. Wright & Arthur R. Miller, Federal

---

that it would be inconsistent with such law."  28 U.S.C. § 1443.   Neither prong of this statute applies to the present case.   The first ground for removal does not apply because New London does not here allege that *its* rights under a law providing for equal rights (if such rights even existed as to a municipal entity) are being denied or cannot be enforced in state court.   *See Johnson v. Mississippi*, 421 U.S. 213, 219 (1975) ("[A] removal petition under 28 U.S.C. § 1443(1) must satisfy a two-pronged test.   First, it must appear that the right allegedly denied the removal petitioner arises under a federal law providing for specific civil rights stated in terms of racial equality. . . . Second, it must appear, in accordance with the provisions of § 1443(1), that the removal petitioner is 'denied or cannot enforce' the specified federal rights 'in the courts of (the) State.'" (citations and some internal quotation marks omitted)); *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d Cir. 1988) (Section 1443(1) only "permits removal by a defendant whose petition recites facts that would be sufficient, if true, to permit the federal court to infer that in the state proceeding the defendant will be denied specific equal civil rights.").   The second ground for removal does not apply because New London does not allege that it either is seeking to enforce a law providing for equal rights or that it is seeking to avoid violating such a law.   *Greenberg v. Veteran*, 889 F.2d 418, 421 (2d Cir. 1989) ("The purpose of the 'refusal clause' is to provide a federal forum for suits against state officers who uphold equal protection in the face of strong public disapproval."); *Quirk v. State of N.Y. Off. of Ct. Admin.*, 549 F. Supp. 1236, 1239 (S.D.N.Y. 1982) (Haight, J.) ("[T]he color of authority clause is available only to 'federal officers or agents and those authorized to act with or for them in affirmatively executing duties under any federal law providing for equal civil rights.'" (quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966)).   Accordingly, 28 U.S.C. § 1441 is the only statutory basis for removal to this Court.   *See New Haven Firefighters Loc. 825 v. City of New Haven*, 120 F. Supp. 3d 178, 183 (D. Conn. 2015) (Haight, J.) ("28 U.S.C. § 1443(1) [is] a specialized application of removal jurisprudence whose caption reveals its relatively narrow character: 'Civil rights cases.' Other statutory removal provisions are more general and less precise.   For example, if a plaintiff's state court complaint asserts a claim under the United States Constitution or a federal statute, the defendant's right to remove the case to federal court is absolute.").

Practice & Procedure § 3522 (3d ed. 2020) (collecting cases).   Subject matter jurisdiction is a fundamental limitation on the power of this Court, and it neither can be created by parties' consent nor be waived or forfeited.   *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982); *Arbaugh v. Y&H Corp*, 546 U.S. 500, 514 (2006).

Federal question jurisdiction, which is conferred on the District Courts by 28 U.S.C. § 1331, is one of the few permissible bases on which cases may proceed in this Court.   *See, e.g.*, *Fed. Ins. Co. v. Speedboat Racing Ltd.*, 200 F. Supp. 3d 312, 325 (D. Conn. 2016) ("In general, a federal district court may exercise subject matter jurisdiction over an action if there is either: (1) federal question jurisdiction . . . or (2) there exists diversity of citizenship, . . . and the amount in controversy exceeds . . . $75,000, exclusive of interest and costs.") (citations and internal quotation marks omitted)).   "Federal question jurisdiction exists whenever the complaint states a cause of action under federal law that is neither 'clearly . . . immaterial and made solely for the purpose of obtaining jurisdiction' nor 'wholly insubstantial and frivolous.'" *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 701 (2d Cir. 2000) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)); *see also New York v. Shinnecock Indian Nation*, 686 F.3d 133, 138 (2d Cir. 2012) ("A cause of action raises an issue of federal law only when 'a right or immunity created by the Constitution or laws of the United States . . . [is an] essential [element] of the . . . cause of action.'" (quoting *Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936)).

As a general rule, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district . . . embracing the place where such action is pending." 28 U.S.C. § 1441(a).   Accordingly, a case is removable from a state court to the relevant District Court on federal question grounds when the federal question appears on the face of the

well-pleaded complaint. *See McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 145 (2d Cir. 2017) ("Under the 'well-pleaded complaint rule,' a defendant generally may not 'remove a case to federal court unless the *plaintiff's* complaint establishes that the case arises under federal law.'" (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207–08 (2004)); *see also First Am. Casino Corp. v. Eastern Pequot Nation*, 175 F. Supp. 2d 205, 207 (D. Conn. 2000).

Removal, however, is not irreversible: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). The Court's duty to remand for lack of subject matter jurisdiction is one it may exercise *sua sponte*. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level." (citation omitted)); *see also Royal Ins. Co. v. Jones*, 76 F. Supp. 2d 202, 204 (D. Conn. 1999). When the Court considers this issue, "the party asserting jurisdiction bears the burden of proving that the case is properly in federal court . . . . Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper." *United Food & Com. Workers Union, Loc. 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994) (citations omitted); *see also Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004) ("[T]he defendant bears the burden of demonstrating the propriety of removal." (citation and quotation marks omitted)). "[I]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." *Purdue*

*Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (quoting *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994)).

## III.    Discussion

In the case at the bar, the Court is confronted by an unusual situation where both Parties presently argue that the Court has subject matter jurisdiction, notwithstanding that New London has deprived Speer of her chosen forum.   The Court will in due course consider both Parties' arguments, but the burden of establishing subject matter jurisdiction remains with New London as the removing Party.

### a.   The Tax Injunction Act & Comity in Tax-Related Cases

The Tax Injunction Act provides that "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."   28 U.S.C. § 1341.[13]   "[T]he principal purpose of the Tax Injunction Act [is] 'to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes.'"   *California v. Grace Brethren Church*, 457 U.S. 393, 408–09 (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 522 (1981)).   *See also Hibbs v. Winn*, 542 U.S. 88, 104–05 (2004) ("[I]n enacting the [Tax Injunction Act], Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority."); *Miller v. N.Y. Div. of Tax App.*, 480 F. Supp. 2d 574, 578 (E.D.N.Y. 2007) ("The [Tax Injunction Act] prevents the federal courts from exercising subject matter jurisdiction over a plaintiff's attempt to prevent a state from collecting taxes." (citations omitted)).   "[T]he act is rooted in principles of federalism and in recognition of a state's need to administer its own fiscal operations . . . ."

---

[13] "State taxation, for § 1341 purposes, includes local taxation."   *Hibbs v. Winn*, 542 U.S. 88, 100 n.1 (2004) (citations omitted).

*Bernard v. Vill. of Spring Valley*, 30 F.3d 294, 297 (2d Cir. 1994) (citing *Long Island Lighting Co. v. Town of Brookhaven*, 889 F.2d 428, 431 (2d Cir. 1989)).   In addition to injunctive relief, the Tax Injunction Act prohibits declaratory relief "[b]ecause the declaratory judgment 'procedure may in every practical sense operate to suspend collection of the state taxes until the litigation is ended.'"   *Grace Brethren Church*, 457 U.S. at 408 (quoting *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299 (1943)).   The Tax Injunction Act's jurisdictional bar applies to cases brought under section 1983.   *Hickmann v. Wujick*, 488 F.2d 875, 876 (2d Cir. 1973) ("Basing a complaint upon alleged violation of civil rights, 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983[,] or of the Federal Constitution will not avoid the prohibition contained in Section 1341." (citations omitted)).

Not all cases related to state taxation come within the Tax Injunction Act's scope.   *See Hibbs*, 542 U.S. at 105 ("Nowhere does the legislative history announce a sweeping congressional direction to prevent federal-court interference with all aspects of state tax administration." (internal quotation marks and citation omitted)); *see also Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015) ("To give 'restrain' the broad meaning selected by the Court of Appeals would be to defeat the precision of that list . . . . Such a broad construction would thus render 'assessment [and] levy'—not to mention 'enjoin [and] suspend'—mere surplusage, a result we try to avoid.").   "For an action to fall within the [Tax Injunction Act's] prohibition, two conditions must be met. First, a plaintiff must challenge 'the assessment, levy or collection' of a state or local tax. . . . Second, 'the state remedies available to plaintiffs must be plain, speedy and efficient.'" *Rosa v. City of Syracuse*, No. 5:16-cv-1123, 2017 WL 4326517, at *4 (N.D.N.Y. Sept. 28, 2017) (citing *Hibbs*, 542 U.S. at 104–05, and quoting *Hattem v. Schwarzenegger*, 449 F.3d 423, 427 (2d Cir. 2006)).   Thus, for example, the Tax Injunction Act has not prohibited

federal district courts from hearing challenges to the adequacy of notices given to delinquent taxpayers of planned foreclosures on their properties where those taxpayers did not thereby challenge the taxes that had been assessed. *Luessenhop v. Clinton Cty.*, 466 F.3d 259, 264–68 (2d Cir. 2006). However, the Tax Injunction Act has denied a federal forum to plaintiffs claiming, *inter alia*, that a Connecticut municipality's "practice . . . of turning over taxpayers' payments to the marshal who served the warrant, who then retain[ed] the marshal's fee before returning the balance to the city, violate[d]" their constitutional rights, since those plaintiffs were challenging the municipality's method of collecting taxes. *Piedmont Gardens, LLC v. LeBlanc*, 168 F. Supp. 3d 391, 395–97, 399–400 (D. Conn. 2016), *aff'd* 733 F. App'x 576 (2d Cir. 2018).

In addition to the bar imposed by the Tax Injunction Act, the United States Supreme Court and the Second Circuit have explained that principles of comity further restrict this Court's ability to hear and decide cases bearing on state and local taxation. "More embracive than the [Tax Injunction Act], the comity doctrine applicable in state taxation cases restrains federal courts from entertaining claims for relief that risk disrupting state tax administration." *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 417 (2010) (citing *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 102 (1981)); *see also Abuzaid v. Mattox*, 726 F.3d 311, 315 (2d Cir. 2013) ("The comity doctrine instructs federal courts to refrain from granting relief to taxpayer-plaintiffs in suits that contest taxpayer liability in a manner that interferes with a state's administration of its tax system."). Federal courts' extensions of comity in matters related to state taxation existed long before the passage of the Tax Injunction Act, and "the Tax Injunction Act may be best understood as but a partial codification of the federal reluctance to interfere with state taxation." *Nat'l Priv. Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 590 (1995). "Unlike the [Tax Injunction Act], the comity doctrine is nonjurisdictional." *Direct Mktg. Ass'n*,

575 U.S. at 15.   Nonetheless, as relevant to the case at the bar, "the principle of comity . . . prevents a taxpayer from seeking damages in a § 1983 action if a plain, adequate, and complete remedy may be had in state court."  *Long Island Lighting Co.*, 889 F.2d at 431 (citing *Fair Assessment*, 454 U.S. at 116).[14]

### b.  Speer's Complaint Challenges Tax Collection

In its supplementary brief, New London argues that the Tax Injunction Act is not applicable to this case because Speer "is not seeking a federal-court ruling on a local tax matter, nor is she taking issue with Connecticut Tax Code or the Tax Auction process.  The plaintiff's case is not centered to [sic] the collection of taxes by the City, but instead, the constitutionality of the Governor's COVID restrictions."  Def.'s Supp. at 5–6.   New London points to various statements that Speer has made in her Complaint and supplemental brief as evidence for its thesis.   *E.g.*, Compl. ¶ 5 ("The COVID Restrictions include numerous facets that would impair a tax auction, or any auction, for that matter."); Compl. ¶ 13 ("The Plaintiff . . . is mindful that the COVID Restrictions have been threatened by the Governor and even municipalities to be rolled back, reinstated and continually changed for the foreseeable future, indefinitely."); Pl.'s Supp. at 5 ("The circumstances in the instant matter involve one man, the Governor, having taken steps to

---

[14] In *Fair Assessment*, the Supreme Court observed—without deciding—that an exception to comity's limitation on the power of the federal courts might exist when a section 1983 claim "requires no scrutiny whatever of state tax assessment practices, such as a facial attack on tax laws colorably claimed to be discriminatory as to race."  *Fair Assessment*, 454 U.S. at 107 n.4.   Any exceptions to comity's bar, such as they may be, remain extremely rare under subsequent precedents.   *See Joseph v. Hyman*, No. 09-cv-7555, 2010 WL 3528854, at *3 (S.D.N.Y. Aug. 30, 2010) ("*Levin* . . . clarified that comity is more expansive than the *Hibbs* footnote suggested. . . . The Supreme Court explained that *Hibbs* did not 'recast the comity doctrine' as a general matter. . . . Rather, *Hibbs* involved an unusual 'confluence of factors' that were sufficient, taken in the aggregate, to overcome comity's constraints and allow plaintiffs a federal forum. . . . First, the plaintiffs in *Hibbs* were attempting to vindicate a fundamental constitutional right. . . . Second, the plaintiffs were 'third-party challengers,' . . . 'outsiders . . . whose own tax liability was not a relevant factor' in their suit . . . . Third, the federal court in *Hibbs* was no less equipped than a state court to fashion a remedy, because only one remedy was possible: invalidation of the tax credit, a measure that would not violate the Tax Injunction Act because it would not enjoin, suspend, or restrain state tax collection. . . . Thus, the *Levin* Court held that, *absent some combination of the above factors that would justify a federal forum, comity generally dictates that challenges to state tax schemes belong in state court*." (internal citations omitted and emphasis added)).

render each and every substantial requirement to carry out [Conn. Gen. Stat.] § 12-157 impossible to accomplish and erratically unpredictable.").

"Collection," the Supreme Court has said "is the act of obtaining payment of taxes due. . . . [W]e have previously described it as [the] part of the 'enforcement process . . . that "assessment" sets in motion.'" *Direct Mktg. Ass'n*, 575 U.S. at 10 (quoting *Hibbs*, 542 U.S. at 102 n.4).  Reviewing the Complaint and Speer's papers with the liberality they are due,[15] the Court does not agree with the City that, just because the crux of much of this dispute hinges on the effects of Governor Lamont's executive orders, this case is outside the scope of the Tax Injunction Act.  Even assuming that Speer should have sued Governor Lamont alongside or instead of New London,[16] her claims unequivocally pertain to "the act of obtaining payment of taxes due."

Speer has pleaded the binding nature of the Governor's COVID-19 related orders on the City.  *See, e.g.*, Compl. ¶ 3.  As discussed earlier in this opinion, *see supra* at I.C, Speer further alleges that among the requirements thereby imposed are "masks that would obstruct the ability of other participants to see whether bidders were speaking," as well as "limitations on crowds, and social distancing, which impairs the ability to conduct a live auction that would most closely approximate the true, fair market value of the properties being sold."  Compl. ¶ 5. Connecticut's facial coverings requirement and gathering size restrictions plainly supplement (if they do not supersede) the other directions of Conn. Gen. Stat. § 12-157 that New London's tax

---

[15] The Court construes the pleadings of *pro se* litigants liberally and interprets them as raising the strongest arguments they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006); *see also Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) ("As the Supreme Court has made clear, 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

[16] Without deciding the matter here, I will reiterate my observation at oral argument, in response to New London's urging that Speer cannot assert a section 1983 claim against it because it has had no involvement in the issuance of

collector ordinarily would be bound to observe, such as the requirement that the property be awarded to the highest bidder or be transferred to the City itself. *See* Conn. Gen. Stat. § 12-157(c).

While the civil preparedness and public health emergencies declared by the Governor persist, the various limitations imposed by or pursuant to the Governor's executive orders are *essential* parts of the "enforcement process" New London will utilize to turn Speer's tax debts into dollars in its treasury. *See* Exec. Order 9C § 2(c) ("*Notwithstanding* any provision of the Connecticut General Statutes . . . any municipality . . . conducting an in-person auction pursuant to this order *shall take steps* consistent with recommendations by local or state public health officials . . . to reduce the transmission of COVID-19, *including but not limited to* maintaining distance of at least six feet between all people present, requiring masks . . . ." (emphasis added)); *see also* Exec. Order 11A § 1 ("Sector Rules *shall constitute legally binding guidance*." (emphasis added)). Speer's Complaint, fairly read, makes this argument: she does not generally question the constitutionality of Conn. Gen. Stat. § 12-155 *et seq.*, or the use of auctions to sell property, but rather "she challenges the circumstances and modifications under which [the tax sale] is being pursued." Compl. ¶ 17. It is evident that to avoid the State's current strictures, the City would have to resort to a different mechanism for raising the revenue owed. Accordingly, the Court has no trouble concluding that, in contesting the present circumstances under which tax auction sales are obliged proceed—if they are to go forward at all—Speer challenges an "act of obtaining payment of taxes due."[17]

---

the Governor's orders affecting tax sales: "The governor sets the stage, but it's the City of New London that comes out onto the stage and begins to sing the opera." Hr'g Tr. 15:13–15:15.

[17] The Court notes that the foregoing analysis applies to Speer's argument that *Fair Assessment* is distinguishable because she "is not challenging the assessment as was the case in [*Fair Assessment*]. She is challenging the threatened deprivation of her property and any overage she would be owed should a true, fair auction not occur as a consequence of COVID-19 restrictions." Pl.'s Supp. at 6. Put simply, any deprivation Speer might suffer could

That Speer's Complaint relates to enjoining or restraining "tax collection" further becomes clear when one considers the potential effect of the declaratory and injunctive relief that she seeks.   If the Court were to hear and rule upon Speer's pending motion, I could not but risk stopping entirely the City's presently existing process for liquidating Speer's debts, allowing her to avoid paying her taxes for some time yet.   *See* Compl. ¶ 16 ("Plaintiff seeks an order . . . that the tax sales not proceed unless or until the Governor ends all COVID Restrictions.").   This is *exactly* the kind of disruptive court action the Tax Injunction Act forbids.   *Cf. Luessenhop*, 466 F.3d at 268 (concluding that because "taxpayers are not attempting to avoid paying state taxes," it followed that "these cases do not raise the specter of federal courts reducing the flow of money into state coffers—the evil that the [Tax Injunction Act] was intended to eradicate.").

In addition, with respect to principles of comity, New London appears to argue that the doctrine primarily applies when a taxpayer seeks to increase another's tax burden, making the present case distinguishable.   *See* Def.'s Supp. at 5 (citing *Levin*, 560 U.S. 413, and *Joseph v. Hyman*, 659 F.3d 215 (2d Cir. 2011)).   This reading of the caselaw is plainly incorrect.   As *Fair Assessment* and *Long Island Lighting Co*. attest (two cases the City itself cites), damages claims brought by taxpayers pursuant to section 1983 arising out of their *own* tax burdens are eminently within the class of cases comity counsels this Court not to hear.   *See Fair Assessment*, 454 U.S. at 105–07, 113–17; *Long Island Lighting Co.*, 889 F.2d at 429–30, 431–33; *see also, e.g.*, *Tonina v. Ferraro*, No. 3:19-cv-00970, 2020 WL 3489520 (D. Conn. June 26, 2020) (holding, in relevant part, that comity barred claim for damages based on allegations that town's tax

---

only come about because of tax collection, to which *Fair Assessment* applies with equal force.   *See Piedmont Gardens*, 168 F. Supp. 3d at 397–99.   Speer additionally appears to argue that *Fair Assessment* is distinguishable because it involved a Fourteenth Amendment equal protection claim, not Fifth Amendment takings claim.   Pl.'s Supp. at 5.   The differing constitutional bases of the claims in *Fair Assessment* and in this case are of no import: the Tax Injunction Act and comity considerations have prevented federal courts from hearing Fifth Amendment takings claims as much as they have prevented them from hearing Fourteenth Amendment equal protection claims.   *See,*

assessments against plaintiff's real and personal property violated plaintiff's constitutional rights).   Here, Speer's Complaint includes a prayer for damages alongside ones for declaratory and injunctive relief, and her request is rooted in her personal tax liability and the means that will be used to satisfy it.   Compl. at 8.   As in other cases, Speer's claiming section 1983 damages is sufficient for comity to be a relevant consideration for this Court, in view of the Complaint's relation to a particular tax collection scheme (the non-judicial tax sale) under Connecticut's tax regime.

### c.   Speer Possesses Adequate State Law Remedies

Having established that Speer's Complaint and pending motion for temporary injunctive relief would, if acted upon, cause this Court to "enjoin, suspend or restrain" acts of "tax collection," or potentially lead to an award of damages arising out of the same, I am bound to examine whether Speer possesses a "plain, speedy and efficient" remedy in Connecticut's courts, as is required for the Tax Injunction Act's bar (or comity's, for that matter) to apply.[18]   *See Rosa*, 2017 WL 4326517, at *4.   A remedy is "plain, speedy, and efficient" when "the available state-court procedures satisfy certain 'minimal procedural criteria,' including a 'full hearing and judicial determination at which [a taxpayer] may raise any and all constitutional objections to the tax.' . . . The availability of typical 'state administrative and judicial procedures' through which a party can ultimately challenge the validity of the tax in court satisfies these criteria."   *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 737 F.3d 228, 233–34 (2d Cir. 2013) (quoting *Rosewell*, 450 U.S. at 512, 514, and citing *Grace Brethren Church*, 457 U.S. at 412).   "The state

---

*e.g.*, *Tonina v. Ferraro*, No. 3:19-cv-00970, 2020 WL 3489520 (D. Conn. June 26, 2020); *Rosa v. City of Syracuse*, No. 5:16-cv-1123, 2017 WL 4326517 (N.D.N.Y. Sept. 28, 2017).

[18] "There is 'no significant difference' between the 'plain, speedy and efficient' standard set forth in the Tax Injunction Act and the 'plain, adequate, and complete' standard governing comity. . . . 'Both phrases refer to the obvious precept that plaintiffs seeking protection of federal rights in federal courts should be remitted to their state

remedy need not be the best remedy available or even equal the remedy which might be available in federal court." *Piedmont Gardens*, 168 F. Supp. 3d at 399 (citing *Finizie v. City of Bridgeport*, 880 F. Supp. 89, 94 (D. Conn. 1995)); *see also Entergy Nuclear Vermont Yankee*, 737 F.3d at 234 ("The requirement that the remedy be 'plain, speedy and efficient' does not, however, suggest that the remedy must possess any unique attributes that facilitate or accelerate the process of challenging a tax." (citing *Rosewell*, 450 U.S. at 516–17)).

New London barely addresses the issue of Speer's available state court remedies in its supplemental brief.  The City simply asserts that that there is no "plain speedy, and efficient remedy" available to Speer because her case concerns Governor Lamont's orders.  Def.'s Supp. at 8.  *Ipse dixit* is not a persuasive argument at any time, and the Court will not accept it here. Moreover, the Court has had no trouble in identifying a range of state court remedies of which Speer could avail herself and in which she could raise her constitutional concerns regarding the effects of Governor Lamont's orders, instead of litigating in this forum.

In the first instance, Connecticut has several tax-specific statutory procedures in Connecticut Superior Court whereby taxpayers may contest not only their tax liability, but also related constitutional claims.  *See* Conn. Gen. Stat. §§ 12-117a, 12-119, 12-129; *Finizie*, 880 F. Supp. at 94–95.  These statutory remedies have been reviewed by several judges of this Court, who in each case have found these remedies sufficient for aggrieved taxpayers to contest assessments or collections of taxes, thereby precluding federal court intervention.  *See Finizie*, 880 F. Supp. at 94–95; *see also Tonina*, 2020 WL 3489520, at *3; *Piedmont Gardens*, 168 F. Supp. 3d at 399–400; *Murphy v. City of Stamford*, No. 3:13-cv-00942, 2013 WL 5776903, at *7

---

remedies if their federal rights will not thereby be lost.'"   *Long Island Lighting Co.*, 889 F.2d at 431 (quoting *Fair Assessment*, 454 U.S. at 116 n.8).

(D. Conn. Oct. 25, 2013); *Marshall v. Town of Middlefield*, No. 3:07-cv-1079, 2008 WL 5157753, at *4 (D. Conn. Dec. 5, 2008), *aff'd* 360 F. App'x 227 (2d Cir. 2010).

New London offers no argument why these statutory remedies are not applicable to the case at the bar, nor why my colleagues' findings in the cited cases should not apply here.  To the extent that these statutory remedies could not, however, supply relief in the present context, the Court perceives that Speer possesses several alternative procedures in Connecticut Superior Court that are not tax-specific but can be used to pursue the substance of her claims.

As noted earlier in this opinion, *see supra* at I.A, the statutory scheme and Connecticut's courts recognize that Speer generally can pursue relief for purported harms arising out of the tax auction sale process using Connecticut's declaratory judgement procedure (Conn. Gen. Stat. § 52-29) and its stand-alone procedure for injunctive relief (Conn. Gen. Stat. § 52-471), and that she may also seek damages.  *See* Conn. Gen. Stat. §§ 12-159a(a), 12-159a(c); *Assocs. Fin. Servs. of Am., Inc.*, 700 A.2d at 111.  Declaratory judgment seems to be a particularly apt remedy under the circumstances, given possible limits on the availability of injunctive relief,[19] and it is frequently used by Connecticut courts to adjudicate both taxpayer claims and claims pertaining to constitutional harms. *See, e.g.*, *Stafford Higgins Indus., Inc. v. City of Norwalk*, 245 Conn. 551, 715 A.2d 46 (1998) (holding, in action bringing claims pursuant to Conn. Gen. Stat. § 12-119 and Conn. Gen. Stat. § 52-29, that delay in implementing property revaluation was authorized by statute and that such delay did not result in an equal protection violation); *37*

---

[19] Section 12-159 provides, in relevant part, that "No act done or omitted relative to the assessment or collection of a tax, including everything connected therewith, after the vote of the community laying the same, up to and including the final collection thereof or sale of property therefor, shall in any way affect or impair the validity of such tax as assessed, collected or sought to be collected or the validity of such sale, unless the person seeking to enjoin or contesting the validity of such sale shows that the collector neglected to provide notice pursuant to [Conn. Gen. Stat. § 12-157], to such person or to the predecessors of such person in title, and who had a right to notice of such sale, and that the person or they in fact did not know of such sale within six months after it was made, and provided such property was by law liable to be sold to satisfy such tax."  Conn. Gen. Stat. § 12-159.

*Huntington Street, H, LLC v. City of Hartford*, 772 A.2d 633 (Conn. App. Ct. 2001) (affirming Superior Court finding, in declaratory judgment action, that statutory immunity from municipal tax liens granted to Federal Deposit Insurance Corporation as mortgagee of property did not extend to subsequent possessor of Corporation's interest, where city sought to collect delinquent taxes through Conn. Gen. Stat. § 12-157 procedure); *Pace Motor Lines, Inc.*, 1996 WL 383398, at \*3–\*16 (holding in declaratory judgment action that, *inter alia*, plaintiffs had no substantive due process right to a commercially reasonable tax sale of their properties, for sales pursuant to Conn. Gen. Stat. § 12-157).   With Conn. Gen. Stat. § 52-29 available—a "typical judicial procedure"—the Court has no doubt that Speer could achieve, on an *ex ante* basis, a "full hearing and judicial determination" of the constitutional issues raised in her suit.

In addition, were none of Conn. Gen. Stat. §§ 12-117a, 12-119 or 12-129 available to her, Speer evidently could pursue damages under section 1983 in Connecticut state court.   *Cf. Zizka v. Water Pollution Control Auth. of Town of Windham*, 195 Conn. 682, 688–90, 490 A.2d 509 (1985) (applying apparent policy underlying 28 U.S.C. § 1341 to Connecticut courts and holding plaintiff payors of sewer assessments could not bring section 1983 claims for, *inter alia*, for damages, where General Assembly *had* fashioned an exclusive and adequate remedial system for challenging excessive sewer assessments).[20]   The availability of such section 1983 damages in Connecticut's courts can supply a "plain, speedy and efficient" remedy that triggers Tax Injunction Act's and comity's bars.   *See Fair Assessment*, 454 U.S. at 116 (availability of section 1983 claims in Missouri state courts supported conclusion that Missouri provided adequate remedies); *Long Island Lighting Co.*, 889 F.2d at 432 ("A second procedurally

---

[20] As a matter of federal law, the United States Supreme Court has held that "When a litigant seeks declaratory or injunctive relief against a state tax pursuant to § 1983 . . . state courts, like their federal counterparts, must refrain from granting federal relief under § 1983 *when there is an adequate legal remedy*."   *Nat'l Priv. Truck Council, Inc.*, 515 U.S. at 592 (emphasis added).

adequate remedy in which LILCO might attack the constitutionality of the assessment methodology would be a § 1983 action in state court.").  With this opportunity for section 1983 damages on top of the availability of declaratory relief, the Court does not doubt that Speer possesses state court remedies well in excess of the minimal requirements that trigger application of both the Tax Injunction Act and considerations of comity.  In Connecticut's state courts, Speer will have tools that in fact "equal the remedy which might be available in federal court," allowing her to remain financially whole or to reclaim what she alleges to be hers.

Speer, for her part, does not contest that Connecticut's courts generally could supply her with appropriate relief.  Not only did Speer first bring this action in Superior Court, she states that "There are normal procedures for hearings on temporary injunctions and for tax sales under § 12-157.  Normally, this action would not be before this Court."  Pl.'s Supp. at 4.  Speer argues, however, that the present times are *not* normal, and that the Court accordingly should hear her claims.  *Id.*  Speer claims that "The Governor has repeatedly rearranged the judicial landscape in all matters before the Superior Court," that "The Superior Court, at present has an unprecedented backlog that started with Executive Order 7G and which has been extended by Executive Order 10A in terms of suspending court requirements and deadlines," and that "The Governor, not the Parties, has chosen to render existing substantive and due process procedures both in Court Rules and Statutes unworkable."  *Id.* at 3–4.  Attempting to distinguish her case from *Fair Assessment*, Speer urges that "The courts of Missouri were not closed.  Access was not restricted."  *Id.* at 5.

While the Court appreciates Speer's desire that her claims be resolved promptly, general delays in receiving relief do not make state court remedies insufficiently "speedy," within the meaning of the Tax Injunction Act.  As the Supreme Court explained in *Rosewell*, "'Speedy' is

perforce a relative concept, and we must assess the 2-year delay against the usual time for similar litigation."   450 U.S. at 519.   In the circumstances of that case, where a two-year wait for a tax refund (which was not accompanied by payment of any interest) was not out of line with the time required for resolving other legal disputes, the Supreme Court found that plaintiff's waiting for relief was regrettable but did not create a procedural deficiency, and thus her remedy was sufficiently "speedy."   *Id.* at 519–20.   In our circuit, even longer state court delays have been found to satisfy the Tax Injunction Act's narrow procedural requisites, where those delays were not unique to the type of proceeding involved.   *See Long Island Lighting Co.*, 889 F.2d at 433 ("While we have some concern over any proceeding that takes over ten years to come to trial, the delay in these proceedings appears to arise less from the inadequacy of the proceeding itself than from a combination of problems of state-court administration and the considerable tactical maneuverings engaged in by both LILCO and defendants.").   In the case at the bar, the Court perceives that if Speer experiences any delays in resolving her claims in Connecticut state court, her experience will not be unique and she will not be unusually burdened: at the present time, all disputes before Connecticut's courts, including ones raising constitutional claims, are subject to the same conditions.   These are manifestly "problems of state-court administration," not defects in the particular procedures that can resolve Speer's claims, and thus do not permit Speer to proceed in a federal forum.

Considering Speer's argument regarding the unusual circumstances of the present day more generally, I find that the limitation of the Court's subject matter jurisdiction admits of no COVID-19 pandemic exception or expansion.   "'It is a fundamental precept that federal courts are of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v.*

*Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978)).   No act of Congress since the onset of the pandemic has worked to lift or modify the jurisdictional bar imposed by the Tax Injunction Act.   Furthermore, in a time of such systemic stress—particularly to state and local fiscs—comity in matters of state and local taxation seems particularly apt.   *See, e.g.*, *Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 110 (1870) ("It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public."); *see also Perez v. Ledesma*, 401 U.S. 82, 128 n.17 (1971) (Brennan, J. concurring in part and dissenting in part) ("The special reasons justifying the policy of federal noninterference with state tax collection are obvious. The procedures for mass assessment and collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules. State tax agencies are organized to discharge their responsibilities in accordance with the state procedures. If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts.").

In view of her ample state court remedies, the Tax Injunction Act—as well as principles of comity—deprives this Court of any power to decide Speer's claims, whatever their ultimate merit.

### IV.    Conclusion and Orders

For the reasons set forth above, the Court finds that it lacks subject matter jurisdiction over this dispute. New London, as the party seeking to remove this action to the federal courts, has failed to meet its burden to show that neither the Tax Injunction Act's bar nor the principles of comity applicable to suits regarding state taxation do not apply to this matter.   It is apparent to the Court that Speer's Complaint challenges methods of tax collection under Connecticut law, and Connecticut provides appropriate procedural avenues for her to air her constitutional claims.

In the absence of subject matter jurisdiction, it would be improper for the Court to resolve any of the issues raised by the motion for temporary injunction pending before it.  *See, e.g.*, *Adams v. Deal*, No. 3:19-cv-994, 2020 WL 509692 at *4 (D. Conn. Jan. 31, 2020) ("While the Defendants proffer alternate reasons why this Court should dismiss the complaint . . . the Court is without authority to consider these arguments, having concluded that it lacks subject matter jurisdiction [under Tax Injunction Act] over the action." (citing *Belcher v. Wells Fargo Bank, N.A.*, No. 3:09-CV-757, 2009 WL 1581101, at *2 (D. Conn. June 3, 2009)); *Macagna v. Town of East Hampton*, No. 09-cv-3064, 2010 WL 3257729 (E.D.N.Y. Aug. 16, 2010) (granting plaintiff's motion to remand case without resolving defendants' motions to dismiss, having found want of jurisdiction under Tax Injunction Act and principles of comity).   Therefore, the Court DENIES Speer's motion for temporary injunction WITHOUT PREJUDICE to renewal in the appropriate state judicial forum.   The Court additionally DENIES the motion to waive bond as moot, since the motion for temporary injunction no longer is pending.

As noted earlier in this opinion, section 1447 directs that when this Court perceives it lacks subject matter jurisdiction over a matter, it is obligated to remand the case to the state court.  *See* 28 U.S.C. § 1447(c).  Having found that this Court lacks subject matter jurisdiction over this action under the Tax Injunction Act, 28 U.S.C. § 1341, the Court REMANDS this case for further proceedings in the Connecticut Superior Court for the Judicial District of New London, where it originated.[21]  This order of remand is not subject to appeal.  28 U.S.C. § 1447(d); *Price v. J & H Marsh & McLennan, Inc.*, 493 F.3d 55, 59 (2d Cir. 2007) ("[S]ection 1447(d) prohibits appellate review when a district court remands based on (1) a defect other than lack of subject matter jurisdiction presented in a timely remand motion or (2) a determination that the court lacked subject matter jurisdiction." (citing *Shapiro v. Logistec USA Inc.*, 412 F.3d 307, 313 (2d Cir.2005)).

The Clerk is directed to close the file.

It is SO ORDERED.

Dated: New Haven, CT
        April 30, 2021

s/ Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge

---

[21] It may be possible that, where further proceedings in state court could not be pursued upon remand, a case might be dismissed instead of remanded under a futility exception to section 1447(c).  *See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 87–89 (1991) (considering and rejecting application of futility exception, without deciding such exception existed).  However, the explicit language of section 1447(c) admits of no futility exception, *see id.* at 89, and the Second Circuit appears to disfavor implying the existence of such an exception.  *See Zanotti v. Invention Submission Corp.*, No. 18-cv-5893 (NSR), 2020 WL 2857304, at *10 (S.D.N.Y. June 2, 2020) (citing *Barbara v. N. Y. Stock Exch., Inc.*, 99 F.3d 49, 56 n.4 (2d Cir. 1996)).  The Court thus perceives remand to be the only available course here.